UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

GRM CORPORATION,

          Plaintiff,

                                            Case Number 06-15231-BC
v.                                         Honorable Thomas L. Ludington

MINIATURE PRECISION COMPONENTS,
INC.,

          Defendant.
_____/

**ORDER DENYING DEFENDANT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT
AND CANCELLING HEARING**

On August 29, 2007, Plaintiff GRM Corporation filed an amended complaint against

Defendant Miniature Precision Components, alleging breach of contract and requesting an

accounting. Now pending before the Court is Defendant's motion for partial summary judgment

under Federal Rule of Civil Procedure 56.

The Court has reviewed the parties' submissions and finds that the facts and the law have

been sufficiently set forth in the motion papers. The Court concludes that oral argument will not aid

in the disposition of the motion. Accordingly, it is **ORDERED** that the motion be decided on the

papers submitted. *Compare* E.D. Mich. LR 7.1(e)(2).

I.

Plaintiff manufactures primary and secondary thermostats with overmolded seals (parts 91

and 92). Defendant sells engine components to Chrysler.

According to Plaintiff's complaint, Defendant issued a request for quotation (RFQ) to

Plaintiff on November 21, 2003 for production and sale of primary and secondary thermostats. The

RFQ was for model years 2005 to 2009 and specified an estimated annual quantity of 690,000 parts. Dft. Br., Ex. A [dkt #38-1]. The RFQ further stated that the "standard pack quantities and shipments [were] not to exceed estimated annual usage and would be shipped to [Defendant's] weekly releases." *Id.*

Plaintiff completed the RFQ on December 10, 2003, attesting to the feasibility of Defendant's part specifications. Dft. Br., Ex. B [dkt #38-2]. The form stated that the quote would be used for the life of the part, including service, which for Chrysler is 15 years. *Id.* The feasibility sign-off also stated, "The data provided in this request should be used as a basis for analyzing your ability to meet all the specified requirements," and Plaintiff responded positively to an inquiry listed there: "Can you meet all specified requirements at the volume levels?" *Id.*

On August 26, 2004, Defendant sent Plaintiff two award letters announcing that it was "pleased to award you [its] business on the products indicated below [i.e., the primary and secondary thermostats]." Dft. Br., Ex. C [dkt #38-3]. The award letters included purchase orders for each part, including the phrase "blanket order." Dft. Br., Ex. D [dkt #38-4]. The order for primary thermostats stated, "Quoted pricing is for production and service. Service requirements are 10 years after production." *Id.* Both orders also stated, "PPAP and 600 pcs. Due on 1/24/05." *Id.* Both of Defendant's orders are signed by Roger Johnson. *Id.*

The purchase orders also included terms and conditions. *See* Pl. Am. Cplt., Ex. E [dkt #27-7]. The first provision states:

> 1. CONTRACT. The contract resulting from the acceptance of this order is to be construed according to the laws of the state form [*sic*] which this order issued as shown by the address of Buyer, which is printed on the face of this order. This contract is non-assignable by Seller.

*Id.* The terms and conditions further state:

2. DELIVERY SCHEDULES. Time is of the essence hereof, in accepting this order, Seller agrees to perform this order and make deliveries hereunder as required hereby. Deliveries are to be made both in quantities and at times specified in schedules furnished by Buyer. Buyer will have no liability for payment for material or items delivered to Buyer which are in excess of quantities specified in the delivery schedules. Buyer may from time to time change delivery schedules or direct temporary suspension of scheduled shipments.

*Id.* Those terms and conditions further provide:

4. CANCELLATION. Buyer reserves the right to cancel all or any part of the work covered by this order if Seller does not make deliveries as specified in the schedules or so fails to make progress as to endanger timely performance fo the work and does not correct such failure within ten (10) days after receipt of written notice from Buyer specifying such failure, or if Seller breaches any of the terms hereof, including the warranties of Seller.

*Id.*

The parties agree that the RFQs, the feasibility sign-offs, the award letters, and the purchase orders constitute the contracts for these transactions, but they disagree on the meaning of some of the terms and the characterization of the contracts as requirements contracts. Plaintiff alleges that it shipped 237, 991 primary thermostats and 242,071 secondary thermostats to Defendant.

According to the declaration of Defendant's purchasing manager, Thomas Mazur, the combination of the term "blanket order" with the statement that a purchase order is for price only meant "that [Plaintiff] had to provide [Defendant] with any parts that [Defendant] ordered at the stated price without the need for another purchase order. The term '[b]lanket [o]rder' does not provide a quantity and did not require [Defendant] to order any parts." *Mazur Dec.*, ¶ 3; Dft. Br., Ex. 1 [dkt #38]. Plaintiff's chief executive officer (CEO), Lee Steinman, in his deposition, acknowledged that the phrase "piece price only" on a purchase order indicated a price. But he resisted the suggestion that the absence of a specific quantity term left the purchase order without

any quantity, because he insisted that the purchase order and the prior quotation for 690,000 pieces should be read together.

Regarding exclusivity, Plaintiff's CEO stated that Defendant and Plaintiff never discussed whether Plaintiff would be Defendant's exclusive supplier for the thermostats and that the contracts did not include any exclusivity term. Plaintiff's CEO, however, insisted that Plaintiff was the exclusive supplier, based on the volumes that Defendant required and based on the fact that Plaintiff was unaware of any other supplier to Defendant of these products. He believed that Plaintiff had a contract with Defendant to provide it with all the volume of those parts that Defendant needed. Further, he knew that the entire quantity of thermostat components by Plaintiff's supplier was going only to Plaintiff, and he maintained that only Plaintiff and that next-level supplier had the required approval to produce the thermostats. His understanding was that Plaintiff would meet Defendant's needs for thermostats, to the extent that Defendant required them for engines it produced for Chrysler. Business fluctuations might affect Chrysler's orders, so Plaintiff's CEO expected that the volume produced by Plaintiff would match the volume required of Defendant by Chrysler. (Based on the deposition of a Chrysler employee, Justin Rajewski, a tier-one supplier like Defendant cannot change tier-two suppliers, like Plaintiff, without Chrysler's approval.) He also maintained that Defendant was obligated to do business with Plaintiff for as long as the job ran, just as Plaintiff was obligated to provide parts at the agreed upon price for that time period.

The parties do not dispute that, on or about September 1, 2006, Defendant communicated its intention to begin producing the thermostats internally and would, thus, terminate the contracts. That same day, Plaintiff's counsel directed a letter to Defendant advising Defendant of its anticipatory repudiation of the contracts, demanding a retraction, and written assurance of continued

performance. Pl. Am. Cplt., Ex. F [dkt #27-7]. In a letter of September 28, 2006, Defendant

demanded that Plaintiff stop production of the thermostats. Pl. Am. Cplt., Ex. G [dkt #27-8].

Plaintiff has filed an amended complaint against Defendant, alleging breach of contract on

each of the two contracts and requesting an accounting for parts allegedly shipped to and received

by Defendant, for which Defendant has allegedly not paid (in the amount of $118, 381.46).

Defendant filed the instant motion for partial summary judgment as to the two counts of breach of

contract.

Previously, on March 8, 2007, the Court denied Defendant's motion for partial dismissal.

There, the Court concluded that ambiguities in the contract documents allowed the conclusion that

requirements contracts did exist.

## II.

Under Federal Rule of Civil Procedure 56(c), a court must review "pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any," to conclude

that "there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law." The Court must view the evidence and draw all reasonable inferences

in favor of the non-moving party and determine "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party must prevail

as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). When the

"record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there

is no genuine issue of material fact. *Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527,

534 (6th Cir. 2002). The party bringing the summary judgment motion has the initial burden of

informing the district court of the basis for its motion and identifying portions of the record which

demonstrate the absence of a genuine dispute over material facts.  *Mt. Lebanon Personal Care*

*Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002).

III.

Assuming that Michigan law applies, as do the parties, a contract must generally state a

quantity term to be enforceable under the Michigan Uniform Commercial Code.  The statute of

frauds in Mich. Comp. Laws § 440.2201(1) provides:

> Except as otherwise provided in this section , a contract for the sale of goods
> for the price of $1,000.00 or more is not enforceable by way of action or defense
> unless there is a writing sufficient to indicate that a contract for sale has been made
> between the parties and signed by the party against whom enforcement is sought or
> by his or her authorized agent or broker.  A writing is not insufficient because it
> omits or incorrectly states a term agreed upon but the contract is not enforceable
> under this subsection beyond the quantity of goods shown in the writing.

Further, comment 1 to § 2201(1) states:  "The only term which must appear is the quantity term

which need not be accurately stated but recovery is limited to the amount stated."[1]

Yet, Mich. Comp. Laws § 440.2306(1) permits parties to enter into requirements contracts:

> A term which measures the quantity by the output of the seller or the
> requirements of the buyer means such actual output or requirements as may occur in
> good faith, except that no quantity unreasonably disproportionate to any stated
> estimate or in the absence of a stated estimate to any normal or otherwise comparable
> prior output or requirements may be tendered or demanded.

Comment 2 to § 2306 states:

---

[1]Comment 1 to Mich. Comp. Laws § 440.2201 continues in the same vein:

> Only three definite and invariable requirements as to the memorandum are
> made by this subsection.  First, it must evidence a contract for the sale of goods;
> second, it must be "signed," a word which includes any authentication which
> identifies the party to be charged; and third, *it must specify a quantity*.

(Emphasis added.)

Under this Article, a *contract for output or requirements is not too indefinite* since it is held to mean the actual good faith output or requirements of the particular party. Nor does such a contract lack mutuality of obligation since, under this section, the party who will determine quantity is required to operate his plant or conduct his business in good faith and according to commercial standards of fair dealing in the trade so that his output or requirements will approximate a reasonably foreseeable figure. Reasonable elasticity in the requirements is expressed envisaged by this section and good faith variations from prior requirements are permitted even when the variation may be such as to result in discontinuance. A shutdown by a requirements buyer for lack of orders might be permissible when a shutdown merely to curtail losses would not. The essential test is whether the party is acting in good faith.

(Emphasis added). Comment 3 to § 2306 continues:

If an estimate of output or requirements is included in the agreement, no quantity unreasonably disproportionate to it may be tendered or demanded. Any minimum or maximum set by the agreement shows a clear limit on the intended elasticity. In similar fashion, the agreed estimate is to be regarded as a center around which the parties intend the variation to occur.

Consequently, the absence of a specific quantity term is not fatal to a contract, if the quantity term is instead set by a standard of good faith in that commercial context and one party's business requirements. *See General Motors Corp. v. Paramount Metal Products Co.*, 90 F.Supp.2d 861, 873 (6th Cir. 2000) ("A promise to buy of another person or company all or some of the commodity or service that the promissor may thereafter need or require in his business is not an illusory promise and such a promise is a sufficient consideration for a return promise.") (citations and internal quotations omitted); *see also Lorenz Supply Co. v. American Standard, Inc.*, 358 N.W.2d 845, 847 (Mich. 1984) ("A requirements or output term of a contract, although general in language, nonetheless is, *if stated in the writing*, specific as to quantity, and in compliance with § 2-201."); Anno. James Lockhart, Establishment and Construction of Requirements Contracts Under § 2-306(1) Of Uniform Commercial Code, 94 A.L.R. 5th 247 § 2a (2001) ("Were it not for U.C.C. §

2-306, a contract leaving the quantity of goods undetermined would not satisfy the formal requirements of the U.C.C. statute of frauds . . . .").

Defendant provides a citation to a Sixth Circuit case, *Urban Assocs., Inc. v. Standex Electronics, Inc.*, 216 Fed. Appx. 495, 496 (6th Cir. 2007), that describes the structure of a "blanket order." According to that decision, a blanket order is an order that indicates a range of possible quantities and sets the respective prices for each range. In *Urban Assocs.*, which involved an Ohio contract, no obligation arose until a customer issued a shipment or release order against that blanket purchase order. Neither party here has provided any factual basis for concluding that this description captures the meaning of "blanket order" in the industry or as understood by these parties. Plaintiff, however, does not dispute this definition.

If an agreement contains an imprecise quantity term, then parol evidence can clarify the quantity, but parol evidence cannot supply a missing quantity term, if the writing is completely silent as to quantity. *In re Estate of Frost*, 344 N.W.2d 331, 334 (Mich. Ct. App. 1983) (citation omitted). In *Great Northern Packaging, Inc. v. General Tire & Rubber Co.*, 399 N.W.2d 408, 413 (Mich. Ct. App. 1987), the Michigan Court of Appeals permitted the use of parol evidence to provide meaning to an uncertain quantity term, once the court had concluded that the contract did include a quantity term. In *Ace Concrete Products Co. v. Charles J. Rogers Construction Co.*, 245 N.W.2d 353, 356 (Mich. Ct. App. 1976), the court had stated that parol evidence could not prove a quantity term, but that decision did not involve a requirements contract. In *Great Northern Packaging,* 399 N.W.2d at 413, the court treated the term "blanket order" as an imprecise quantity term and then left to the jury to determine what quantity, if any, would be supported by parol evidence. Following this general approach, the court in *Johnson Controls, Inc. v. TRW Vehicle Safety Systems*, 491 F.Supp.2d

707, 717-719 (E.D. Mich. 2007), concluded that an abbreviation for "as released" that appeared in the quantity column of a purchase order sufficed to provide a quantity term, albeit an indefinite one.

Michigan law is not well settled as to whether a requirements contract must be exclusive, i.e., whether all requirements must be purchased from the supplier and all needs of a given type directed to that supplier by the purchaser. In *Acemco, Inc. v. Olympic Steel Lafayette, Inc.*, Unpublished Docket No. 256638; 2005 Mich. App. Lexis 2656, *23 (Mich. Ct. App. 2005), the Michigan Court of Appeals recited (but did not apply) the following standard: "a requirements contract has been described as an agreement in which the seller promises to supply all the specific goods or services which the buyer may need during a certain period at an agreed price in exchange for the promise of the buyer to obtain his required goods or services exclusively from the seller." (Citations and internal quotations omitted). Yet, in *Plastech Engineered Products v. Grand Have n Plastics, Inc.*, Unpublished Docket No. 252532; 2005 Mich. App. Lexis 853, *20 (Mich. Ct. App. 2005), the Michigan Court of Appeals stated that Mich. Comp. Laws § 440.2306 applied to both exclusive and non-exclusive requirements contracts. Apart from these unpublished decisions, little attention has yet been provided by the Michigan courts as to whether a requirements contract must be exclusive. Nothing in the text of Mich. Comp. Laws § 440.2306 appears to require that conclusion.

Drawing all reasonable inferences in favor of Plaintiff, the issue of the existence of a quantity term (and, if necessary, its value) must go to a jury. While Defendant correctly argues that Plaintiff does not assert that "blanket order" constitutes a quantity term, Plaintiff does suggest that that term conveys an ongoing relationship, such as one where Plaintiff was meeting Defendant's requirements. More significantly, the RFQ stated that Defendant's annual quantity of estimated annual usage is 690,000 pieces. The RFQ also stated that "standard pack quantities and shipments [were] not to

exceed estimated annual usage and would be shipped to [Defendant's] weekly releases." The

feasibility sign-off stated, "The data provided in this request should be used as a basis for analyzing

your ability to meet all the specified requirements," and Plaintiff responded positively to an inquiry

listed there: "Can you meet all specified requirements at the volume levels?" This language,

referring to "releases" and "requirements," alone suffices to indicate the existence of requirements

contracts.

Further, Defendant's purchasing manager attested "that [Plaintiff] had to provide [Defendant]

with any parts that [Defendant] ordered at the stated price without the need for another purchase

order." This business arrangement is consistent with concluding that Plaintiff and Defendant agreed

to have Plaintiff fulfill Defendant's thermostat requirements. That this explanation is also consistent

with other business arrangements, such as a blanket purchase order as described in *Urban Assocs.*,

against which Defendant could later issue shipment order, only further reinforces the existence of

a contested issue of fact.

Also, assuming the availability of parol evidence, either to clarify an ambiguous (but extant)

quantity term or to clarify the meaning of the terms of the contract, the context of Plaintiff and

Defendant's business relationship also supports concluding that they entered into requirements

contracts. Plaintiff contends that it alone supplied the entire volume of Defendant's thermostat

needs and that Plaintiff alone received all the components from the sole supplier approved to

produce the components necessary for Defendant's thermostat needs. Additionally, according to

Plaintiff, a tier-one supplier like Defendant cannot change tier-two suppliers, like Plaintiff, without

Chrysler's approval. Thus, Plaintiff advances a theory that Plaintiff and only Plaintiff was supplying

all the thermostats that Defendant required. Even without assuming that Michigan law requires

exclusivity to find that a requirements contract exists, the asserted tightness of the relationships between Plaintiff and its supplier and between Defendant and Plaintiff, which allegedly were exclusive, would support concluding that the parties agreed to have Plaintiff supply Defendant with a product required by Defendant's ultimate purchaser, Chrysler.

Accordingly, Defendant has not shown the absence of any genuine issues of material fact or its entitlement to judgment as a matter of law. The Court will deny Defendant's motion for summary judgment. The absence of any clear reference to "requirements contracts" but the presence of the term "requirements," the inclusion of an annual quantity to be shipped per "release" issued by Defendant, and the structure of each party's business relationships create a genuine issue of material fact as to whether the parties entered into requirements contracts.

IV.

Accordingly, it is **ORDERED** that Defendant's motion for partial summary judgment [dkt ##36, 37] is **DENIED**.

It is further **ORDERED** that the hearing scheduled for **January 8, 2008** at 2:30 p.m. is **CANCELLED**.


s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge


Dated: January 8, 2008

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on January 8, 2008.

s/Tracy A. Jacobs
TRACY A. JACOBS